**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

**Criminal Case No. 01-Cr-210**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | ) |
| | ) |
| **Plaintiff,** | ) |
| **v.** | ) |
| | ) |
| **WILLY FARAH,** | ) |
| **Defendant.** | ) |

**Defendant's Sentencing Memorandum**

**COMES NOW** Defendant Willy Farah, by and through undersigned counsel, and hereby respectfully submits this Sentencing Memorandum to assist the Court in the resolution of issues that will be before the Court at the re-sentencing of Mr. Farah currently scheduled for September 27, 2005.

## 1. Procedural History of the Case

This case originated with a March 1991 indictment. On October 11, 2001, Mr. Farah pled guilty pursuant to a plea agreement with the government to all of the eight counts pending against him in the original indictment, plus an additional count contained in a superseding indictment. On January 7, 2004, the sentencing proceeding was held with respect to both cases. Under the plea agreement, the government and the defendant had entered into stipulations regarding the proposed sentencing guidelines calculations, which resulted in a proposed offense level of 26. PSR, Part A, ¶ 19. The district court rejected these calculations and concurred with the Probation Officer's determination that an offense level of 32 applied, with a resulting

sentencing range of 135 months to 168 months. After granting the government's motion for a downward departure pursuant to U.S.S.G. § 5K1.1, the district court sentenced Mr. Farah to 100 months imprisonment, three years of supervised release, restitution of $11,327,612.04, and special assessments of $750.

Mr. Farah appealed the Court's sentencing decision with regard to two guidelines issues: (1) the determination of the amount of loss under U.S.S.G. § 2F1.1(b)(1); and (2) the application of a "sophisticated means" enhancement under U.S.S.G. § 2F1.1(b)(6)(C). The appeal was based on both substantive grounds and on the procedural ground presented by the U.S. Supreme Court decision in *Blakely v. Washington*, 542 U.S. ___, 124 S. Ct. 2531 (2004), which was followed during the pendency of the appeal by *United States v. Booker*, 543 U.S. ___, 125 S. Ct. 738 (2005).

On March 4, 2005, the The Third Circuit Court of Appeals vacated the sentence and remanded for resentencing in accordance with *Booker*. With respect to the substantive guidelines issues raised by Mr. Farah, the Court of Appeals stated that these issues "are best determined by the District Court in the first instance."

**2. <u>The Sophisticated Means Enhancement</u>**

Prior the Supreme Court's decision in *Booker*, there was an outstanding question whether a sentencing Court rather than a jury could determine guidelines enhancements. Mr. Farah's appeal of the sophisticated means adjustment was based in large part on this unanswered question. As a result of *Booker*, it is clear that such determinations are within the province of the sentencing court. Accordingly, Mr. Farah *will not* be contesting the sophisticated means

enhancement in the resentencing.

**3. The Computation of the Amount of Loss**

**a. Actions taken at original sentencing**

As a part of the plea agreement in the case, the government and the defense entered into a stipulation (not binding on the Court) that the applicable specific offense characteristic was U.S.S.G. § 2F1.1(b)(1)(P), which provides a 15 level increase to the level 6 base offense level for losses of between $10,000,000 and $20,000,000. PSR, Part A, ¶ 14.2. The PSR rejected this finding, which was based on the actual loss to the investors and to the bank ($11,327,612.04), and instead applied what the Probation Officer considered to be the "intended loss". This was determined by the PSR to be $20,080,000, the aggregate total of the payments made by the investors and the aggregate amount of credit extended by the bank over the course of time. PSR, Part A, ¶¶ 72, 96. This resulted in a one level increase in the specific offense characteristic, from 15 to 16 levels.

At the sentencing proceeding, both the government and the defense argued that the Court should apply the "actual loss" figure rather than the figure used in the PSR, the defense arguing that the actual loss was a better measure of the "intended loss" than the figure used in the PSR because of the Mr. Farah's remission of funds back to the investors in accordance with the investment contracts. The Court rejected the joint position of the parties, taking the position that the loss should be based on the amount "at risk", and that this would necessitate the use of the

figure proposed in the PSR, i.e., the aggregate amount of payments from the investors plus the total amount of the bank credit line.

**b. <u>The use of the amount "at risk" is at odds with both current law and with Third Circuit Court of Appeals precedent that governed at the time that the crime was committed.</u>**

As part of a series of amendments in 2003, the United States Sentencing Commission resolved a previous Circuit conflict and explicitly determined that courts should total the loss in Ponzi schemes based on the net loss to the victims after crediting the defendant with payments made to perpetuate the scheme. U.S.S.G. § 2B1.1 Application Note 3(F)(iv) (2001). If the current sentencing guidelines were applied to the facts of this case, the loss would be the $11 million actually lost by the investors (giving Mr. Farah credit for the repayments made suing the course of the scheme) rather than the higher figure initially invested.

Prior to the 2003 amendment of the Guidelines, the majority of the Circuits had held that a defendant should not be credited with payments he made to victims during the course of his criminal scheme. However, the Third Circuit Court of Appeals adopted the minority position. In *United States v. Kopp*, 951 F.2d 521 (3d Cir. 1991), a bank fraud case, the Court reviewed a loss determination that had been based on the total amount of the fraudulent loan, notwithstanding the fact that the bank recouped the amount of loan after foreclosing on the property that secured the loan. After reviewing the Circuit split on this issue, the Court concluded as follows:

> We therefore confirm our tentative view above and hold that fraud "loss" is, in the first instance, the amount of money the victim has actually lost (estimated at the time of sentencing), not the potential loss as measured at the time of the crime. However, the "loss"

> should be revised upward to the loss that the defendant intended to inflict, if that amount is higher than actual loss.

Id. at 536. The Court accordingly vacated the sentence and remanded the case for resentencing.

The Third Circuit Court of Appeals has subsequently qualified the position set forth in *Kopp* in three other bank fraud scenarios. In *United States v. Badaracco*, 954 F.2d 928, 937 (3d Cir. 1992), the Court applied a "gross gain" analysis in a bank fraud case where the defendant had not pledged anything of value for the loan; in *United States v. Shaffer*, 35 F.3d 110, 113-15 (3d Cir. 1994), the Court ruled that in check kiting cases the bank loss should be determined as of the date of discovery of the scheme rather than the date of sentencing; and in *United States v. Geevers*, 226 F.3d 186, 190 (3d Cir. 2000), another check kiting case, the Court ruled that district court could have reasonably inferred that the defendant intended to defraud the bank of the full amount of the kited checks. None of these cases repudiated the holding of *Kopp* and none of the cases are apposite to this case.

The Court applied the principles of *Kopp* outside the bank fraud area in *United States v. Yeaman*, 193 F.3d 442 (3d Cir. 1999), a wire and securities fraud case. In *Yeaman*, the government argued that loss should be determined based on the face value that the defendant had assigned to certain fraudulently inflated securities (the potential loss) rather than on the amount of funds that the defendant expected to receive if his scheme were successful. The latter amount was simply the aggregate insurance premiums collected by the defendant reduced by payments of insurance claims necessary to keep the scheme alive.

The *Yeaman* Court rejected the government's position, explaining its holding in a passage that merits quoting at length:

> We do not agree that Yeaman and his co-conspirators intended to cause a loss equal to the amount of the represented value of the leased stocks. Intended loss refers to the defendant's subjective expectation, not to the risk of loss to which he may have exposed his victims. *Unites States v. Kopp*, 951 F.2d 521, 529-531 (3d Cir. 1991). Yeaman and the others undoubtedly hoped that their fraudulently inflated securities would never have to be sold and that the scheme would continue for the indefinite future. The loss that they intended was the premiums Teale would receive less any payment of claims necessary to keep the scheme alive. We express no view at this juncture as to whether the current record will support a finding of an intended loss in excess of the actual loss. Additionally, while we do not foreclose the District Court from considering the gain of Yeaman and the others on remand, their gain would not appear to us to be a helpful alternative in this factual context. That gain would appear to be limited to an amount equal to the minimum actual loss we have held to be appropriate, i.e., to the premiums received by Teale after Yeaman's joinder, less any claims paid in order to maintain the scheme, including any amounts paid by Teale in satisfaction of the outstanding claims upon liquidation.

Id. at 460. In this case, determination of the amount of loss based on the amount "at risk" would thus conflict with well-established Third Circuit precedent and would in essence duplicate the sentencing errors made by the district courts in *Kopp* and *Yeaman*.

**c. Even assuming, arguendo, that the amount "at risk" is somehow relevant to the loss computation, the actual amount at risk in this case would not have justified the disputed one-level increase.**

The Court's loss determination of $20,080,000 at the original sentencing included a total of $4,130,000 received by Mr. Farah from investor Johan Fontanesi under two different investment contracts. The April 22, 1996 $1,630,000 payment made by Mr. Fontanesi on the

second investment contract occurred *after* Mr. Farah had returned substantial funds to him from the first investment contract, including a payment to Mr. Fontanesi of $750,000 on April 2, 1996. PSR, Part A, ¶¶ 33-34. The greatest amount Mr. Fontanesi ever had at risk with Mr. Farah was thus the original $2,500,000 payment, plus the subsequent $1,630,000 payment, *minus* the intervening payments made by Mr. Farah to Mr. Fontanesi. Reduction of the district court's computation by these amounts would place the amount of loss at less than $20,000,000 and consequently would result in the application of the 15 level enhancement rather than the 16 level enhancement.

Respectfully submitted this 20th day of September, 2005.

Respectfully submitted,

**s/ Kenton V. Sands______________**

Kenton V. Sands
Fla. Bar # 0788708
Attorney for Defendant
SANDS WHITE & SANDS, P.A.
390 N. Orange Avenue, Suite 1800
Orlando, Florida 32801
Phone: (407) 423-3421
Fax: (407) 423-4735
E-mail: kent@sandswhitesands.com

**CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that on September 20, 2005, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following: Michelle Brown, Assistant U.S. Attorney, U.S. Attorney's Office, 970 Broad Street, Sixth Floor, Newark, New Jersey 07102.

**s/Kenton V. Sands______________**
Kenton V. Sands
Fla. Bar # 0788708
Attorney for Defendant
SANDS WHITE & SANDS, P.A.
390 N. Orange Avenue, Suite 1800
Orlando, Florida 32801
Phone: (407) 423-3421
Fax: (407) 423-4735
E-mail: kent@sandswhitesands.com